UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LIIBAN ABDI GEELE,

                        Petitioner,

        v.

MARKWAYNE MULLIN, *et al.*,

                        Respondents.

Case No. C26-1647-MLP

ORDER

        Through counsel, Petitioner Liiban Abdi Geele filed a petition for writ of habeas corpus under 28 U.S.C. § 2241, challenging his detention by U.S. Immigration and Customs Enforcement ("ICE") at the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington. (Dkt. # 1.) Respondents filed a timely return (dkt. # 5), along with an unsworn declaration from their counsel, Peter Clark (dkt. # 6) ("Clark Decl."), and a sworn declaration from U.S. Department of Homeland Security ("DHS") Deportation Officer Karl Douglas (dkt. # 7) ("Douglas Decl."). Petitioner filed a timely traverse in reply. (Dkt. # 8.)

        Having considered the parties' submissions and the governing law, the Court GRANTS in part the petition (dkt. # 1) for the reasons set forth below.[1]

[1] The parties consented to proceed before the undersigned Magistrate Judge. (Dkt. # 3.)

ORDER - 1

## I.    BACKGROUND

Petitioner is a native and citizen of Somalia, who first entered the United States near San Ysidro, California on July 31, 2022. (Douglas Decl., ¶¶ 3-4.) He was apprehended by U.S. Customs and Border Protection ("CBP") and issued a Notice to Appear ("NTA"), charging him with being inadmissible under the Immigration and Nationality Act ("INA"). (*Id.*, ¶ 5.) He was thereafter released into the United States and required to enroll in an Alternatives to Detention ("ATD") program. (*Id.*, ¶ 6; *see* Clark Decl., ¶ 2, Ex. 2.) While on release, Petitioner filed an application for asylum and related relief in the Memphis Immigration Court. (Dkt. # 1, ¶ 3.) His asylum hearing was scheduled for June 2, 2026, at which time he was detained at NWIPC. (*Id.*)

In April 2026, Petitioner sought permission from ICE, "[p]ursuant to the terms of his [Order of Release on Recognizance]," to leave Washington State to attend his own wedding in Ohio scheduled for April 27, 2026. (Dkt. # 1, ¶ 7.) Petitioner asserts that he was originally instructed by ICE to provide the Ohio address at which he would be staying, but on the day before his planned departure, "received a communication from ICE notifying [him] that his request to leave the state was denied." (*Id.*).

Petitioner asserts that, "[d]ue to his very limited understanding of English, he did not [initially] understand that his request had been rejected." (Dkt. # 1, ¶ 7.) After arriving in Columbus, Ohio, Petitioner received a phone call from an ICE officer, who instructed him to return to Seattle. (*Id.*, ¶ 8.) Petitioner asserts that he tried to explain to the ICE officer that he had a return flight to Seattle scheduled for April 28, 2026, and that he would check in with ICE as soon as he returned. (*Id.*)

After returning to Washington, Petitioner reported to the Tukwila ICE office for his scheduled April 28, 2026, check-in. (Dkt. # 1, ¶¶ 8-9; Douglas Decl., ¶ 9.) He was taken into

ORDER - 2

custody, and ICE revoked his order of release. (Douglas Decl., ¶ 11.) Petitioner was transferred to the NWIPC, where he remains detained. (*Id.*)

Petitioner discusses his ATD compliance in his petition and acknowledges being informed during his April 28, 2026, check-in that he is alleged to have "missed biometrics check-ins" and "failed home visits" between August 6, 2024, and April 28, 2026. (Dkt. # 1, ¶¶ 4-6.) As for the missed biometrics check-ins, Petitioner asserts that he was "required to wear a GPS tracking device which required frequent charging." (*Id.*) Petitioner asserts that on several occasions, the battery ran out of power while he was sleeping. (*Id.*) As for the missed home visits, Petitioner explains that he "was required to be at his residence from 6:00 A.M. to 6:00 P.M and to be prepared for a video call with an ICE officer" and "presumes that he must have left his home on those days, most likely to run an errand of some sort." (*Id.*, ¶ 6.)

Respondents primarily rely on Deportation Officer Douglas to provide their version of the circumstances leading up to Petitioner's arrest and redetention. (*See generally* dkt. # 5.) Officer Douglas states that "[b]etween August 31, 2022[,] and April 24, 2026, Petitioner missed approximately twenty-five check-ins or other procedures required by the terms of his ATD." (*Id.* at 2 (citing Douglas Decl., ¶¶ 9-10).) The Court observes that the excerpts from Petitioner's immigration file, provided by Respondents, document fourteen violations. (*See* Clark Decl., ¶ 2, Ex. 1 at 2.) The terms of Petitioner's ATD are not before the Court and Respondents do not acknowledge or resolve the discrepancy.

On May 14, 2026, Petitioner filed the instant petition, alleging that his redetention without first receiving notice or an individualized hearing before a neutral decisionmaker violates his due process rights under the Fifth Amendment and the Administrative Procedure Act

ORDER - 3

("APA"). (Dkt. # 1 at 11-18.) He seeks release from detention and other related relief. (*Id.* at 18-19.)

## II. LEGAL STANDARDS

District courts may grant writs of habeas corpus "within their respective jurisdictions." 28 U.S.C. § 2241(a). This authority extends to challenges to immigration detention. *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001). A petitioner may obtain relief by showing that he is "in custody in violation of the Constitution or laws or treaties of the United States[.]" 28 U.S.C. § 2241(c). The petitioner bears the burden of proof by a preponderance of the evidence. *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

## III. DISCUSSION

Petitioner raises three claims challenging his redetention. In his first two claims, Petitioner alleges under the APA that his arrest and subsequent revocation of conditional release were both an abuse of discretion and not in accordance with the law. (Dkt. # 1 at 11-14.) His third claim asserts that, under the framework articulated in *Mathews v. Eldridge*, 424 U.S. 319 (1976), procedural due process entitled him to pre-deprivation notice and an opportunity to respond prior to his redetention. (*Id.* at 8-10, 14-18.) Respondents do not dispute that *Mathews* governs (*see* dkt. # 5 at 8-11), but argue that there is a statutory basis for Petitioner's detention under 8 U.S.C. § 1225(b), that his redetention is lawful when assessed under the *Mathews* framework, and that the Court lacks subject matter jurisdiction over Petitioner's remaining APA claims. (*Id.* at 7, 8-12.) Respondents further argue that Petitioner is, at most, entitled to a "prompt, post-detention hearing" instead of release. (*Id.* at 11.)

//

//

ORDER - 4

**A.      The *Mathews* Framework**

Due process protections extend to all persons within the United States, including noncitizens, regardless of immigration status. *Zadvydas*, 533 U.S. at 693. Procedural due process requires meaningful notice and a genuine opportunity to be heard before the federal government infringes a protected liberty interest. *Mathews*, 424 U.S. at 333. In immigration detention cases, courts in this Circuit apply the *Mathews* balancing test, weighing: (1) the private interest affected; (2) the risk of erroneous deprivation under existing procedures and the value of additional safeguards; and (3) the government's countervailing interest, including fiscal and administrative burdens. *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206-07 (9th Cir. 2022); *see E.A. T.-B. v. Wamsley*, 795 F. Supp. 3d 1316, 1321 n.4 (W.D. Wash. 2025) (collecting cases).

In line with this authority, the Court applies the *Mathews* framework to Petitioner's redetention.

**1.      *Private Interest Affected by the Official Action***

Having spent over three years living in the United States after ICE allowed his conditional release, Petitioner has a liberty interest in remaining free from immigration detention. The Supreme Court has recognized that "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) (the interest in not being detained "is the most elemental of liberty interests").

Respondents acknowledge the "weighty liberty interests implicated by the Government's detention of noncitizens." (Dkt. # 5 at 9 (quoting *Reyes v. King*, 2021 WL 3727614, at *11 (S.D.N.Y. Aug. 20, 2021)).) Nevertheless, Respondents cite to *Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976), to support their argument that noncitizens have a lessened liberty interest

ORDER - 5

compared to U.S. citizens, particularly when the liberty interest has been conditionally granted. (*Id.*) Further, according to Respondents, "the Supreme Court has repeatedly 'recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process.'" (*Id.* (citing *Demore v. Kim*, 538 U.S. 510 (2003)).) The Court does not find this argument particularly helpful at this stage in the *Mathews* analysis.

In *Mathews v. Diaz*, the Court was answering the question of whether it was permissible for Congress to condition a noncitizen's eligibility for Medicare Part B on continuous residence in the United States for a five-year period and admission for permanent residence. *Mathews*, 426 U.S. at 69. Notably, the challenge was brought by a group of noncitizens who were denied enrollment. *Id.* at 69-70. Thus, the question presented was not whether it was permissible for Congress to enact discriminatory laws between citizens and noncitizens; it was whether it was permissible to allow benefits to some noncitizens but deny them to others. *Id.* at 80. While the quoted language from Respondents' brief does come from *Mathews*, it was to emphasize the Court's broader point that "the fact that an Act of Congress treats [noncitizens] differently from citizens does not in itself imply that such disparate treatment is invidious." *Id.* at 80 (internal quotations omitted). In the preceding paragraph, however, the Court reiterated that "all persons, [noncitizens] and citizens alike, are protected by the Due Process Clause[.]" *Id.* at 78.

In *Demore*, the noncitizen Respondent was challenging the lawfulness of 8 U.S.C. § 1226(c), which mandates detention during removal proceedings for a limited class of deportable noncitizens, including those convicted of an aggravated felony. *Demore*, 538 U.S. at 517-18. Here, neither party is asserting that § 1226(c) applies to Petitioner. Thus, beyond the Court's general recognition that detention of noncitizens is a "valid aspect of the deportation

ORDER - 6

process" (which does not appear to be disputed here), *Demore*'s relevance is limited as it relates to Petitioner's detention.

Regardless, Petitioner does not contend that his liberty interests are equivalent to those of a citizen. He argues his liberty interest exists even when release is conditional. (Dkt. # 1, ¶ 58 (citing *Doe v. Becerra*, 787 F. Supp. 3d 1083, 1093 (E.D. Cal. 2025)).) Further, Petitioner is not challenging immigration detention *per se*, but rather asserting that, despite his release being conditional, it was still entitled to the full protections of due process. (*Id.*) When Petitioner was released after his initial detention, he took with him a liberty interest entitled to the full protection of the due process clause. *Doe*, 787 F. Supp. 3d at 1093. That the government sets conditions of release does not eliminate the protections afforded to Petitioner's liberty interest. *See Hernandez v. Sessions*, 872 F.3d 976, 981 (9th Cir. 2017) ("While the temporary detention of noncitizens may sometimes be justified by concerns about public safety or flight risk, the government's discretion to incarcerate noncitizens is always constrained by the requirements of due process[.]")

The Court therefore does not find that either *Mathews v. Diaz* or *Demore* support Respondents' argument that a noncitizen's liberty interest is reduced (and thus, owed less procedural protection) merely because release is conditional. Petitioner has a strong private interest in his continued liberty and, thus, the first *Mathews* factor weighs in his favor.

        2.      *The Risk of Erroneous Deprivation and the Value of Additional Safeguards*

The risk of erroneous deprivation weighs in favor of Petitioner where, as here, the only articulated basis for his redetention after having lived in the United States for a significant period of time is Respondents' unsupported contention that a pre-deprivation hearing was impracticable and the erroneous application of 8 U.S.C. § 1225(b).

ORDER - 7

The Court initially observes that Petitioner does not dispute that he violated the terms of his release. As discussed above, he acknowledges the various violations and provides his post hoc explanations for missing his biometric check-ins and in-home visits. (*See* dkt. # 1, ¶¶ 4-5.) He similarly acknowledges that he traveled outside Washington State after his request to ICE was denied, which, Petitioner acknowledges, violated the terms of his OREC. (*Id.*, ¶ 7.) Nevertheless, Petitioner argues that, despite these violations, his redetention "in violation of [Respondents'] own regulations" and without "an individualized determination [that he posed] a flight risk or danger to the community" constituted an erroneous deprivation of his liberty interest. (*Id.*, ¶ 61.)

Petitioner does not meaningfully engage with the regulations that he contends Respondents failed to follow (*see* dkt. # 1 at 11-14), and Respondents do not acknowledge or respond to the contention. (*See generally* dkt. # 5.) Rather, Respondents argue that "the risk of a constitutionally significant and erroneous deprivation of Petitioner's liberty did not necessitate a pre-deprivation hearing." (*Id.* at 9.) In support, Respondents rely on *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). According to Respondents, while "[t]he Supreme Court has held that the Constitution requires some kind of hearing before the State deprives a person of liberty or property," *Zinermon* also "recognized that a pre-deprivation hearing is not appropriate in every situation" and that "there may be special cases where a pre-deprivation hearing is impracticable." (Dkt. # 5 at 9-10 (citation modified).)

Thus, according to Respondents, "due process does not require advance process where the government must act promptly based on materially changed circumstances," which Respondents argue, was Petitioner's "clear demonstration" of "noncompliance" that would have

ORDER - 8

made advance notice and a hearing "impracticable and would have undermined the government's ability to respond to those changed conditions." (Dkt. # 5 at 10.)

As the Honorable Tana Lin recently explained in *Sarwari v. Wamsley*, 2026 WL 279968 (W.D. Wash. Feb. 3, 2026), a case discussing an identical argument advanced under *Zinermon* by the government:

> *Zinermon* does not suggest there *may be special cases* [where a pre-detention hearing is not required]; rather, it discusses a single, discreet "special case" known as "the *Parratt* rule" and represented by the cases *Parratt v. Taylor*, 451 U.S. 527 (1981), and *Hudson v. Palmer*, 468 U.S. 517 (1984). The *Parratt* rule applies to a unique subset of deprivations where there is no practical way that "predeprivation procedural safeguards *could* address the risk of deprivations" because the nature of the deprivation is such that it cannot be foreseen by the state. In *Parratt*, the deprivation in question was the negligent loss of a person's property while he was in state custody, and in *Hudson*, the deprivation resulted from unauthorized and tortious conduct by a state employee. Under the unusual circumstances where pre-deprivation process is not practicable "because of the random and unpredictable nature of the deprivation" at issue, the *Parratt* rule holds that a tort remedy provides the process that is due.

*Sarwari*, 2026 WL 279968, at *4 (citations omitted).

Similarly, *Zinermon* clearly does not apply to Petitioner's redetention here. Other than summarily concluding that Petitioner's noncompliance made a pre-deprivation hearing impracticable (and thus suggesting Petitioner's redetention constitutes a "special case" under *Zinermon*), Respondents do not articulate the specific circumstances making that so. The impracticability of process Respondents assert here is not the same as the impractical procedural safeguards discussed in *Zinermon* because the deprivation in question (*i.e.*, Petitioner's redetention) was foreseeable and purposeful. Respondents cannot (and indeed, do not) genuinely contend that Petitioner's redetention was so random or unpredictable that pre-deprivation process could not have addressed the risk and was, thus, unnecessary. Accordingly, nothing in the quoted language from *Zinermon* could plausibly support Respondents' argument that the risk of an

ORDER - 9

erroneous deprivation of Petitioner's liberty did not necessitate a pre-deprivation hearing. (Dkt. # 5 at 9.)

As for Respondents' argument that Petitioner is subject to mandatory detention under 8 U.S.C. § 1225(b) (*see* dkt. # 5 at 7-8), the Court remains unpersuaded. *See Corado v. Bondi*, 2026 WL 1113386, at *3 (W.D. Wash. April 24, 2026). The initiation of removal proceedings is not, standing alone, a sufficient basis for detention. Further, courts in this District routinely reject the argument that noncitizens under circumstances similar to Petitioner's here are applicants for admission who are "seeking admission" and therefore subject to detention under § 1225(b). *See, e.g., Rodriguez v. Bostock*, 802 F. Supp. 3d 1297, 1304 n.3 (W.D. Wash. 2025) (collecting cases). Regardless, Petitioner here does not challenge Respondents' statutory classification of his detention—he claims that the Fifth Amendment entitled him to some amount of process before ICE arrested and detained him. (Dkt. # 1 at 14-16.) His claim, therefore, is constitutional, not statutory. *See P.T. v. Hermosillo*, 2025 WL 3294988, at *2 n.1 (W.D. Wash. Nov. 26, 2025) ("To the extent that the Government's briefing suggests that [§] 1225(b) should be the beginning and end of the Court's inquiry, this position is emphatically rejected."); *Francois v. Wamsley*, 2025 WL 3063251, at *3 (W.D. Wash. Nov. 3, 2025) ("Any argument that ICE acted within its authority has no [effect] on a claim contending that detention violates Constitutional Due Process."). Accordingly, Respondents' argument that §1225(b) standing alone justifies Petitioner's arrest and continued detention, or otherwise comports with due process, is unavailing.

When ICE released Petitioner after his initial detention, it did so after determining—as required by regulation—that "such release would not pose a danger to property or persons, and that the [noncitizen] is likely to appear for any future proceeding." 8 C.F.R. § 236.1(c)(8). Courts

ORDER - 10

in this District have found that arresting and detaining noncitizens who were initially detained and released without first reconsidering those factors poses a significant risk of erroneous deprivation. *See, e.g., E.A. T.-B.*, 795. F. Supp. 3d at 1323; *Ledesma Gonzalez v. Bostock*, 808 F. Supp. 3d 1189, 1202-03 (W.D. Wash. 2025); *see also Doe,* 787 F. Supp. 3d at 1094 ("[G]iven that Petitioner was previously found to not be a danger or risk of flight . . . the risk of erroneous deprivation remains high."). As further explained below, nothing in the evidentiary record demonstrates that ICE reconsidered whether Petitioner, due to his release violations or other changed circumstances, was thereafter considered a flight risk or danger to the community. Courts have rejected the application of a bright line rule that any violation of conditions of release, regardless of individualized circumstances, justifies a noncitizen's immediate redetention without notice or an opportunity to respond. *E.g., Randhawa v. Noem*, 2026 WL 628299, at *3 (W.D. Wash. March 6, 2026); *Ramirez Tesara*, 800 F. Supp. 3d 1130, 1137 (W.D. Wash. 2025).

The second *Mathews* factor weighs in Petitioner's favor.

### 3.      *Government Interest and Administrative Burdens*

The government's countervailing interest in redetaining Petitioner without pre-deprivation notice was low. Respondents assert that the *Mathews* test "must account for the heightened government interest in the immigration detention context" and that the government has a strong interest in "preventing noncitizens from remaining in the United States in violation of our law." (Dkt. # 5 at 10 (quoting *Rodriguez Diaz*, 53 F.4th at 1206, 1208 (cleaned up)).) Respondents also argue that the government "has an interest in protecting immigration proceedings from unnecessary delay." (*Id.*) Beyond these general recitations, however,

ORDER - 11

Respondents do not make the connection to Petitioner or argue why those interests are implicated here.

The Court observes that, by Respondents' own records, they were on notice that Petitioner potentially violated the conditions of his release as early as August 2024. (*See* Clark Decl., ¶ 2, Ex. 1 at 2.) Taking Officer Douglas' declaration as true, it was as early as August 2022. (*See* Douglas Decl., ¶ 10.) Yet, it is undisputed that Petitioner was not arrested and redetained until April 2026 and only after he attended a pre-scheduled ICE check-in appointment where "routine system queries" discovered the alleged violations. (*Id.*, ¶ 9; *see* Clark Decl., ¶ 2, Ex. 1 at 2.) Up until that point, there is no evidence that Respondents sought to revoke Petitioner's order of release or otherwise act on Petitioner's alleged noncompliance. On the contrary, it appears Respondents were either unaware of the violations or largely acquiesced in their alleged commission, as evidenced by Petitioner remaining free and enrolled in his ATD program for several years after the violations allegedly occurred. These contemporaneous non-actions undermine any post-hoc argument Respondents advance here suggesting the violations were so egregious that they necessitated Petitioner's redetention without process.

Moreover, as Petitioner argues (*see* dkt. # 1, ¶¶ 43-44), it does not appear Respondents made individualized findings related to his flight risk or dangerousness. *See Hernandez*, 872 F.3d at 994 ("[T]he government has no legitimate interest in detaining individuals who have been determined not to be a danger to the community and whose appearance at future immigration proceedings can be reasonably ensured by a lesser bond or alternative conditions."). Officer Douglas' declaration outlines Petitioner's violations but does not articulate what it was about those violations that required Petitioner's arrest and redetention without notice and an opportunity to respond. ICE's administrative file documents that "ERO management approved a

ORDER - 12

custody redetermination," but Respondents did not provide any related documentation or articulate the findings relevant to that decision. Petitioner's order of release cancellation merely asserts that Petitioner "failed to comply with the conditions of release" and is signed by an unidentified ICE official. (*See* Clark Decl., ¶ 2, Ex. 2.) Nothing else in the evidentiary record independently demonstrates that Petitioner became a flight risk or danger to the community, such that exigency or emergency may have necessitated Petitioner's immediate redetention. To the extent any of this process occurred, or any relevant findings were made, such evidence is not before the Court. The Court also finds it notable that Respondents' return memorandum makes no mention of Petitioner's violations as evidencing risk of flight or dangerousness. (*See generally* Dkt. # 5.) What the evidence does show is that Petitioner maintained communication with his ICE officer both before and after the alleged violations occurred, and, despite being aware of his noncompliant trip to Ohio, subsequently attended his April 28, 2026, ICE appointment on his own volition. (Dkt. # 1, ¶¶ 7-9.) *See Ramirez Tesara*, 800 F. Supp. 3d at 1137 (acknowledging that a noncitizen who sought to remediate potential violations by presenting self in person to ICE officials did not "paint the picture of a flight risk").

Finally, beyond asserting a general interest in preventing delay in immigration proceedings (dkt. # 5 at 10), Respondents are unable to identify any delay that can be attributed to Petitioner. If anything, the delay that *can* be gleaned from the record appears related to Respondents' failure to act on Petitioner's noncompliance.

In sum, the Court is mindful that ICE likely has an interest in reassessing or redetaining noncitizens who are alleged to have violated conditions of their release and is similarly mindful that it has the authority to do so. *See Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019) ("If the government wishes to re-arrest Ortega at any point, it has the power to take steps

ORDER - 13

toward doing so; but its interest in doing so without a hearing is low."). That said, the lack of contemporaneous records discussing the authority that allowed Petitioner's redetention without process, or articulating the interest advanced by it, undermines the little justification Respondents argue here.

The Court finds all three *Mathews* factors favor Petitioner and that habeas relief is therefore warranted. Given the lack of lawful process at the outset of detention and the absence of exigent circumstances, release is the appropriate and constitutionally required remedy. This conclusion aligns with a broad consensus among district courts. *See*, *e.g.*, *Ramirez Tesara*, 800 F. Supp. 3d at 1138; *Rojas v. Almodovar*, 2025 WL 3034183, at *8 (S.D.N.Y. Oct. 30, 2025) (holding that where "detention was invalid at its inception[,]" petitioner is "entitled to release."); *E.A. T.-B.*, 795 F. Supp. 3d at 1324; *Zhu v. Genalo*, 798 F. Supp. 3d 400, 415 (S.D.N.Y. 2025).

**B.      Remaining Claims and Requested Relief**

The Court's Order granting release under *Mathews* renders moot Petitioner's remaining claims under the APA, as the requested relief is duplicative. The Court therefore does not reach those claims.

Petitioner also requests a court order "relieving [him] from the requirements of wearing a GPS tracking device[.]" (Dkt. # 1 at 19.) Petitioner does not provide any factual development or legal argument related to this request in the petition. The request is therefore denied.

**IV.      CONCLUSION**

For the foregoing reasons, the Court ORDERS as follows:

(1)      The petition for writ of habeas corpus (dkt. # 1) is GRANTED in part.

ORDER - 14

(2)     Respondents shall release Petitioner from immigration detention within **twenty-four (24) hours** of this Order, subject to appropriate conditions of supervision consistent with applicable statutory and regulatory authority; and

(3)     Respondents shall file a status report, no later than **two (2) business days** from the date of this Order, confirming that Petitioner has been released.

(4)     Petitioner's remaining claims under the APA are DENIED as moot.

(5)     Petitioner's remaining requests for relief are DENIED.

(6)     The Court will entertain any post-judgment motion for attorney's fees, as requested in the petition. Any fee petition must be filed within the deadline set by the Equal Access to Justice Act, 28 U.S.C. § 2412.

Dated this 9th day of June, 2026.

MICHELLE L. PETERSON
United States Magistrate Judge

ORDER - 15